UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

JOSHUA DONALDSON,
    *Plaintiff/Counter Defendant*,

v.

BILL GROUS,
    *Defendant/Counter Plaintiff*.

No. 3:22-cv-810 (JAM)

**ORDER DENYING**
**DEFENDANT'S MOTION FOR PARTIAL SUMMARY JUDGMENT**

    This federal diversity lawsuit arises from a landlord-tenant relationship gone rotten. The plaintiff leased an expensive home from the defendant, but soon moved out, alleging in part that the home was uninhabitable due to an infestation of mold.

    The defendant now moves for partial summary judgment. He concedes the presence of mold but argues that the home was habitable after he took steps to remediate the mold. Viewing the facts as I must in the light most favorable to the plaintiff, I conclude that there are multiple fact issues about the home's habitability that preclude the grant of summary judgment.

**BACKGROUND**

    Joshua Donaldson, the plaintiff, is a former professional baseball player who was traded from the Minnesota Twins to the New York Yankees on the eve of the 2022 professional baseball season.[1] As a result of this trade, Donaldson was left to secure housing in the New York City area on short notice for himself, his then-fiancée (now wife) Brianna Miller, and their then-17-month-old-daughter.[2] At the time, Miller was expecting the couple's second child.[3]

---

[1] Doc. #60 at 27 (¶ 1); Doc. #62 at 1 (¶ 5).
[2] Doc. #60 at 27 (¶¶ 2-3); Doc. #62 at 1 (¶¶ 1-2).
[3] Doc. #60 at 27 (¶ 4).

1

Donaldson agreed to rent a home from defendant Bill Grous in Greenwich, Connecticut, and the two entered into a lease to that effect.[4] That lease specified a six-month rental, during which time Donaldson was to pay Grous $55,000 per month, as well as a $110,000 security deposit.[5] The lease required Grous to provide the property to Donaldson roughly 72 hours after the lease was signed and to "make all repairs and do whatever is needed to put and keep the [home] in a fit and livable condition."[6]

Miller moved into the home on April 5 and noticed a musty odor "from the moment [she] arrived."[7] But mold was not Miller's first concern. Instead, she initially complained to Grous about a litany of other issues, including: water damage in various bedrooms, holes she noticed in closet walls, issues with the functioning of a toilet and a shower, and nearly a dozen other similar concerns that, according to Donaldson, combined to render the property uninhabitable.[8]

In part, Donaldson argues that a "constant stream of workmen" entering the property to fix these issues prevented him from being able to rest, which in turn hindered his athletic performance.[9] Still, Miller admitted that Grous addressed these repair requests and fixed the underlying issues "promptly."[10]

Within a few weeks, however, Miller and the couple's daughter began to experience head colds, coughing, and congestion, which she reported to her doctor and to her daughter's pediatrician.[11] Donaldson developed some similar symptoms, which he discussed with the Yankees' athletic training staff.[12]

---

[4] *Id.* at 2 (¶¶ 7-8).
[5] *Ibid.;* Doc. #61-1 at 2.
[6] Doc. #61-1 at 4 (¶ 11(b)); Doc. # 60 at 2 (¶ 7).
[7] Doc. #61-5 at 12 (lns. 9-10) & 18-19 (lns. 22-2).
[8] Doc. #62 at 2-3 (¶ 15).
[9] *Id.* at 3 (¶ 18).
[10] Doc. #55-3 at 9 (lns. 7-11).
[11] Doc. #62 at 3 (¶¶ 21-22); Doc. #61-5 at 11 (lns.1-10) & 22-23 (lns. 13-5).
[12] Doc. #61-4 at 4 (p. 31 ln. 6-15) & 5 (p. 39 ln. 8-18).

Because of the symptoms that the family developed and the smell of mold and must, Miller began to focus on concerns that mold might be present. She texted Grous to alert him to the smell of mold in the laundry and powder rooms and asked to have the house checked for mold in those areas.[13]

Miller hired Jack Yanqui of BNF Consulting (an environmental testing company) to conduct testing of the home's guest bedroom and the adjacent bathroom on April 19, 2022.[14] On April 25, Miller emailed to Grous a version of a report prepared by Yanqui with the results of this testing.[15] The report explained that the April 19 testing had revealed the presence of a few different types of mold: Aspergillus/Penicillium in the guest room staircase and bathroom at a "significantly elevated" level, as well as Chaetomium in the bathroom at a "slightly elevated" level.[16]

These results showed the presence of mold at levels "higher than the outdoor air control, higher than a typical building, and higher than typical ambient air," according to Grous's expert in this litigation.[17] The BNF report made several recommendations, including "full demolition of all horizontal and vertical surfaces" making up the staircase, removal of carpeting, demolition of a dividing wall running along the staircase, and in-depth cleaning.[18] BNF further recommended a "post remediation assessment and clearance sampling" to include visual inspections and testing of air samples.[19]

---

[13] Doc. #60 at 8 (¶ 41).
[14] Doc. #55-16 at 2, 4.
[15] Doc. #60 at 9 (¶ 49).
[16] *Id.* at 10 (¶ 50); Doc. #55-16 at 6 (¶ B). The BNF report inconsistently describes the locations tested, at one point referencing that the "guest room and bathroom," at another the "guest bedroom staircase" and "adjacent bathroom," and at another the "bathroom and guest bedroom." *Id.* at 5-6.
[17] Doc. #60 at 10 (¶ 50).
[18] Doc. #55-16 at 6 (¶ C).
[19] *Id. at* 11.

3

Hours after receiving this report, Grous introduced members of Donaldson's team to Crystal Restoration, a mold remediation company, and he asked Donaldson's team to coordinate scheduling of the mold remediation.[20]

In the meantime, on April 29, Yanqui returned to conduct a second round of testing, this time focusing on surface testing rather than air sampling.[21] That testing found "heavy" presence of Stachybotrys and a "very heavy" presence of Aspergillus along the guest bedroom staircase, as well as a "very heavy" presence of Trichothecium and "moderate" presence of Stachybotrys on the surface of the wall running along that staircase.[22]

On the same day, following the initial testing results and at the start of a Yankees' road trip, Donaldson's attorney notified Grous that Donaldson considered the home "currently uninhabitable" and that Grous was thus in breach of the provision of the lease requiring him to keep the home "fit and livable."[23] By the next day, the Donaldson family vacated the home, and never lived in the home again.[24]

With the family gone, Grous authorized the remediation work to begin the next day.[25] The record does not contain a detailed description of the work that Crystal performed.[26] By May 9, however, Crystal deemed the work completed, which was communicated to the Donaldson family on May 10.[27] Donaldson, via counsel, requested additional information about the remediation efforts but did not return to live in the home.[28]

---

[20] Doc. #60 at 10 (¶¶ 52-53).
[21] *Id.* at 10-11 (¶ 55).
[22] Doc. #61-8 at 4 (¶ B).
[23] Doc. #55-21 at 3.
[24] Doc. #60 at 14 (¶ 71).
[25] *Id.* at 15 (¶ 76).
[26] *See generally id.* at 15-17 (¶ 78-80).
[27] Doc. #55-24 at 2; Doc. #60 at 17 (¶ 82).
[28] Doc. #60 at 18 (¶ 83).

On May 12, BNF returned to the home to conduct testing to determine whether the remediated area was clear of mold. That testing found "that the original area of remediation (guest bedroom and bathroom adjacent to the staircase) has been cleared of all visible and apparent mold growth and has met clearance criteria of a passing grade."[29] The same day, however, BNF also tested other portions of the home to determine if mold issues existed beyond the area around the guest bedroom. Testing of the master bedroom and "bedroom #4" showed "significantly higher" levels of Aspergillus than the "baseline."[30] BNF recommended that both bedrooms be cleaned, and Grous followed this recommendation.[31]

After that cleaning, BNF returned on May 19 for another round of testing, which showed that the bedroom no longer contained mold, but that bedroom #4 still had "significantly higher than baseline" levels of Aspergillus.[32] After additional cleaning, BNF returned for a final round of testing on May 25.[33] In this testing, bedroom #4 showed no elevated levels of mold.[34]

On May 17, Donaldson's counsel wrote to Grous's counsel, stating "because the mold infestation remains uncured and the house therefore remains unfit and unhabitable, . . . the lease is terminated as a matter of law."[35] Shortly thereafter, Donaldson filed this suit, alleging among other things that Grous failed to keep the home habitable and thus breached the terms of the lease and violated Connecticut law.[36] Grous contends that the home was habitable, and brought counterclaims for unpaid rent and property damage.[37]

---

[29] Doc. #55-18 at 27-28.
[30] *Id.* at 36.
[31] Doc. #60 at 21 (¶ 96).
[32] Doc. #61-17 at 3.
[33] Doc. #55-18 at 46.
[34] *Id.* at 46-47.
[35] Doc. #61-16 at 2.
[36] *See generally* Doc. #1.
[37] *See generally* Doc. #12.

Grous now moves for summary judgment as to counts two and three of Donaldson's complaint and as to count one of his own counterclaim.[38] Donaldson's count two alleges that Grous breached the terms of the lease by failing to keep the home livable, while count three alleges that the same conduct breached the covenant of quiet enjoyment, and Grous's first counterclaim alleges that Donaldson breached the lease by failing to pay Grous rent and utilities after April of 2022.

## DISCUSSION

The principles governing review of a motion for summary judgment are well-established. Summary judgment may be granted only if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). I must view the facts in the light most favorable to the party who opposes the motion for summary judgment and then decide if those facts would be enough—if eventually proved at trial—to allow a reasonable jury to decide the case in favor of the opposing party. My role at summary judgment is not to judge the credibility of witnesses or to resolve close, contested issues of fact but solely to decide if there are enough facts that remain in dispute to warrant a trial. *See generally Tolan v. Cotton*, 572 U.S. 650, 656–57 (2014) (*per curiam*); *Union Mut. Fire Ins. Co. v. Ace Caribbean Mkt.*, 64 F.4th 441, 445 (2d Cir. 2023).[39]

In this case, all three claims rise and fall on the same question: did the mold render the home unfit to live in? Donaldson's claim for breach of contract turns on whether Grous breached his contractual obligation to keep the home "fit and livable."[40] Donaldson's claim for breach of

---

[38] Doc. #55 at 1-2.
[39] Unless otherwise indicated, this opinion omits internal quotation marks, alterations, citations, and footnotes in text quoted from court decisions.
[40] Doc. #61-1 at 4 (¶ 11(b)). "A lease is a contract." *Hawley Ave. Assocs., LLC v. Robert D. Russo, M.D. & Assocs. Radiology, P.C.*, 130 Conn. App. 823, 828 (2011). "The elements of a breach of contract claim are the formation of an agreement, performance by one party, breach of the agreement by the other party, and damages." *CCT Commc'ns, Inc. v. Zone Telecom, Inc.*, 327 Conn. 114, 133 (2017). Here, Grous contests only the third element—

the covenant of quiet enjoyment turns on whether he was constructively evicted from the home because Grous allowed the home to fall into a state in which habitation was "untenantable."[41] And Grous's counterclaim turns on whether Donaldson can show that, under Connecticut law, Donaldson was relieved of his obligation to pay rent because Grous failed to keep the home "fit and habitable."[42]

For purposes of this motion, the parties do not dispute that the gravamen of a habitability inquiry is whether a home may safely be lived in: "Habitability is defined as 'the condition of a building in which inhabitants can live free of serious defects that might harm health and safety.'" *Collier v. Adar Hartford Realty, LLC*, 2022 WL 18054024, at *10 (Conn. Super. Ct. 2022) (quoting Black's Law Dictionary (8th ed. 2004)).

Each of these three claims raises the same core questions of fact about how dangerous the mold was and when the mold was remediated. At this stage, then, I cannot grant summary judgment unless the evidence, read in the light most favorable to Donaldson as the nonmoving party, permits me to conclude either that the home was habitable throughout or that the home was returned to habitability before the 15-day statutory deadline to remedy inhabitability.

---

breach—and does so only on the grounds of his contention that conditions in the home did not render it unfit and unlivable. *See generally* Doc. #55-1 at 9-18.

[41] "The covenant of quiet enjoyment is the obligation of the landlord to protect his . . . tenant's right to quiet and peaceful possession." *Sullivan v. Nameaug Walk-In Med. Ctr., P.C.*, 35 Conn. App. 185, 190 (1994). "A party pleading breach of the covenant of quiet enjoyment is required to plead either actual or constructive eviction." *Berry v. Black Rock Gardens, LLC*, 2024 WL 2933003, at *9 (Conn. Super. Ct. 2024). Donaldson pleads constructive eviction. Doc. #1 at 7 (¶ 53). "A constructive eviction arises where a landlord . . . has done [] some act by which the premises are rendered untenantable. Thus, the party must plead that (1) the problem was caused by the landlord, (2) the tenant vacated the premises because of the problem, and (3) the tenant did not vacate until after giving the landlord reasonable time to correct the problem." *Berry*, 2024 WL 2933003 at *9.

[42] Connecticut General Statutes § 47a-7(a)(2) provides that the landlord must maintain the property in "fit and habitable" condition, and Section 47a-12(a) requires landlords to remedy any noncompliance with Section 47a-7(a) that "materially affects [the tenant's] health and safety" within "fifteen days after receipt" of a written notice of the dangerous condition. If the landlord fails to remedy the breach within those fifteen days, the lease terminates as of that deadline. *Ibid.* Donaldson contends—and Grous does not dispute, at least at this stage—that he provided the required written notice on April 29, and that May 14 would be fifteen days later.

I cannot reach either conclusion because many of the most important facts in the case remain disputed. Consider, for example, the question of whether the molds in question were dangerous. Grous argues that "there is no evidence that the mold . . . was the type of mold that can affect the health of some people," and so he contends that the home remained habitable throughout.[43] He argues, citing his own expert witness, that "in the vast majority of situations, the presence of mold in a house does not present a danger to the occupants."[44] As an example, he points to the parties' agreement that not all species of Aspergillus cause health risks, and the fact that BNF's testing did not determine which species (singular or plural) of Aspergillus were present in the home.[45]

Donaldson responds that while the exact species of Aspergillus is unknown, the symptoms that the Donaldson family experienced allow a jury to infer that the mold was of the sort that is dangerous to humans.[46] He further points to testimony from BNF's mold testing professionals that Aspergillus can cause lung infections, particularly in children and pregnant women, and testimony from an expert offered by Grous that, in some cases, Aspergillus can be deadly.[47] And Donaldson argues that the presence of Stachybotrys and Chaetomium, both black molds for which BNF has a "no tolerance policy," presented significant health risks regardless of the precise species of mold that was present.[48] As a result, he contends, the mold present in the home was a threat to the health of the home's occupants and rendered the home uninhabitable.

The evidence in the record at this stage straightforwardly presents disputes of fact. Grous and his expert contend that the quantity and type of mold present was not dangerous to human

---

[43] Doc. #55-1 at 2.
[44] *Id.* at 14.
[45] *Ibid.*; *see also* Doc. #60 at 24 (¶¶ 105-06).
[46] Doc. #59 at 23.
[47] *Id.* at 22.
[48] Doc. #59 at 22.

health. Donaldson argues otherwise. He claims that circumstantial evidence in the form of the family's symptoms, alongside testimony from BNF's mold experts about the potential dangers of the types of molds found, produce at minimum a dispute of fact on this issue.

I agree with Donaldson. Choosing between the views of competing experts and assessing whether to make a plausible inference is a job for the jury at trial, not the judge at summary judgment. Accordingly, I cannot conclude that the type of mold in the home was so obviously not dangerous as to warrant summary judgment.

Nor can I conclude, as Grous claims, that the mold—even if dangerous—was not widespread enough to render the home uninhabitable. Grous contends that the mold was localized, contained to a small portion of the 4,500-square-foot home, and thus that the home could not be considered uninhabitable even if the mold were dangerous.[49] But Donaldson points to expert testimony theorizing that mold spores, even if contained to a small area, could have been spread throughout the home by the home's heating and cooling systems.[50] Weighing the credibility of this testimony, or determining whether the mold presented a health risk even if it remained contained to a small area with the home, are similarly tasks for the jury.

Finally, the parties dispute whether the mold issue was remedied before the May 14 statutory deadline. According to Grous, the mold issue was solved by May 9, when Crystal completed its remediation work and confirmed through a visual inspection that mold in and around the guest bedroom was gone.[51] In response, Donaldson points to the results of testing conducted on May 12 and 19 to argue that the mold issue persisted, and was not remedied, until May 25, when testing returned only normal mold levels.[52] If the mold issue rendered the home

---

[49] Doc. #55-1 at 14.
[50] Doc. #59 at 24.
[51] Doc. # 55-1 at 17.
[52] Doc. #59 at 24-25.

9

uninhabitable, then whether the levels and type of mold that persisted after Crystal's initial remediation—that is, the mold found in testing of May 12 and 19—rendered the home still uninhabitable requires the resolution of a disputed issue of fact: the extent of the hazard presented by the remaining Aspergillus. The same expert disputes that prevent me from holding that no reasonable jury could conclude that the Aspergillus in the home presented a health hazard preclude me from further concluding that no reasonable jury could find that the home was uninhabitable after May 14.

Grous points to evidence that the presence of the mold was merely a pretext, and he claims that Donaldson and Miller merely felt buyer's remorse about the contract they entered into and sought an excuse not to hold up their end of the bargain. Perhaps he can argue at trial that this evidence calls into question the credibility of Donaldson and Miller. But—assuming that there is otherwise a genuine fact issue about the habitability of the house—Grous does not explain why such evidence compels a grant of summary judgment in his favor.

Based on the evidence in the record at this stage and viewed in the light most favorable to Donaldson, I cannot say that no reasonable jury could conclude that the mold in question rendered the home uninhabitable, or that no reasonable jury could conclude that the home remained uninhabitable after May 14. And because the mold issue alone precludes summary judgment, I do not need to address Donaldson's allegations of additional problems with the home.  I will deny Grous's motion for partial summary judgment.

## CONCLUSION

For the reasons set forth above, the Court DENIES the defendant's motion for partial summary judgment (Doc. #55).

It is so ordered.

Dated at New Haven this 10th day of December 2024.

                                                                        /s/ *Jeffrey Alker Meyer*
                                                                        Jeffrey Alker Meyer
                                                                        United States District Judge