UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

------------------------------------------------------------- x
                                  :

JOSHUA DONALDSON,                :
                                   :
            *Plaintiff/Counter Defendant,*   :     **RULING ON MOTIONS**
                                   :      ***IN LIMINE***
          -against-                   :
                                   :      3:22-cv-810 (VDO)
BILL GROUS,                        :
                                   :
            *Defendant/Counter Plaintiff.* :
                                   :
------------------------------------------------------------- x

**VERNON D. OLIVER**, United States District Judge:

       Plaintiff Joshua Donaldson leased Defendant Bill Grous's home in Greenwich, Connecticut. Donaldson claims that soon after he and his family moved into the home, they noticed mold and began to experience respiratory issues. They quickly moved out and, a few months later, filed this lawsuit alleging chiefly that the Grous's home was uninhabitable. Grous disagrees, contending that any mold problem was remediated and, in any case, was not substantial enough to render the home uninhabitable. Grous countersued, arguing that the mold was simply a pretext for Donaldson to shirk his obligation to make monthly rental payments.

       Nearly three years into this litigation, the case is now on the verge of trial. As a result, the Parties have moved *in limine* to preclude each other from offering certain testimony and evidence. The Court now resolves these motions in turn.

## I.    <u>ANALYSIS</u>

       Motions *in limine* provide district courts the opportunity to rule in advance of trial on the admissibility and relevance of forecasted evidence. *See Luce v. United States*, 469 U.S. 38, 40 n.2 (1984). Motions *in limine* allow courts to resolve important evidentiary issues without

repeated and protracted interruption of the trial itself. *Palmieri v. Defaria*, 88 F.3d 136, 141 (2d Cir. 1996). "A party may make a motion *in limine* requesting the exclusion of specified evidence or argument and base the motion on any of the grounds available under the Federal Rules of Evidence." 2 *Moore's Manual of Federal Practice and Procedure* § 18.24 (1990).[1]

At the motion *in limine* stage, a court should exclude evidence only if the evidence is clearly inadmissible on all possible grounds. *Levinson v. Westport Nat'l Bank*, No. 09-cv-1955-VLB, 2013 WL 3280013, at *3 (D. Conn. June 27, 2013); *United States v. Ulbricht*, 79 F. Supp. 3d 466, 478 (S.D.N.Y. 2015). That is because the admissibility of evidence or testimony at trial often depends on the context in which the evidence is offered, so "[t]he court also retains discretion to reserve judgment on some or all motions *in limine* until trial." *Bryant v. City of Hartford*, 585 F. Supp. 3d 179, 185 (D. Conn. 2022).

Loosely translated, a motion *in limine* is a motion made "on or at the threshold," *Luce*, 469 U.S. at 40 n.2 (quoting Black's Law Dictionary 708 (5th ed. 1979)), and courts generally issue rulings *in limine* in advance of trial. But the development of a trial is difficult to anticipate. As a result, the context of the trial itself may alter the viability of the proffered basis for a pre-trial ruling. The Court therefore invites any party who believe that the factual record as developed at trial supports a revised ruling to bring such an application in a timely manner.

---

[1] In quotations from legal authority, this opinion omits irrelevant subsequent case history as well as internal citations, quotation marks, and footnotes, and adopts alterations contained therein, unless otherwise noted.

A.    **Grous's motion to preclude testimony regarding emotional distress**

First, Grous seeks to preclude Donaldson or any other witness from offering testimony regarding emotional distress damages. Grous chiefly argues that such damages are unrecoverable under the causes of action that Donaldson has pled. Under a section discussing his claims for breach of contract and breach of the covenant of quiet enjoyment in his damages analysis, Donaldson indicated that he contemplated seeking "compensatory damages for emotional distress/pain and suffering."[2] Grous contends that breach of contract actions cannot support emotional distress damages,[3] and that claims for breach of the covenant of quiet enjoyment fundamentally sound in contract law and therefore also cannot support damages for emotional distress.[4]

Because this Court sits in diversity to exercise jurisdiction over Donaldson's state law claims, substantive legal questions regarding those claims are decided according to Connecticut law. *See Res. Grp. Int'l Ltd. v. Chishti*, 91 F.4th 107, 112 (2d Cir. 2024). Donaldson, for his part, readily concedes that his claim for breach of contract cannot support

---

[2] ECF No. 82-1 at 3.

[3] Absent rare exceptions that neither party argues are present here.

[4] *See generally* ECF No. 82. At the outset, the Court notes that Grous's main argument against this testimony is one of substantive tort law. Claims that turn in the first instance on substantive legal standards rather than the Federal Rules of Evidence are more properly resolved by dispositive motions, such as a motion for judgment as a matter of law. Because the issue presents questions as to what sort of testimony the jury may hear, however, the Court will address the claim now. If Grous believes the Court's conclusion at this stage presents an error of law, however, he is free to move for judgment as a matter of law post-trial. Because this is a close question addressed with limited briefing and authority, the Court would consider such a motion without resort to the law-of-the-case doctrine.

emotional damages and that he has not pled a separate action for emotional distress.[5] But he cites three cases that he claims show that Connecticut law allows for the recovery of damages for emotional distress in an action without physical injury, which is usually considered the limitation on whether a party may recover damages for emotional distress. *See, e.g., Michel v. MAPFRE Ins.*, 2023 WL 6842125, at *2 (Conn. Super. Ct. 2023).[6]

Donaldson overstates the importance of the caselaw he cites in resolving the question presented in this motion. At a high level, it is important to differentiate between (1) a cause of action, or a claim, which provides the basis for the legal violation alleged, (2) the remedy sought—here, monetary damages—and (3) the harms for which monetary damages may be permitted under any given tort. Only at this third level do we reach the issue in the instant motion, which is not whether Donaldson can bring a claim for emotional distress, nor whether he can recover monetary damages for a breach of the covenant of quiet enjoyment. The question, rather, is whether damages for emotional distress may be recovered as part of compensatory damages awarded for a breach of the covenant of quiet enjoyment.

---

[5] "<u>First</u>, Grous argues that 'emotional distress damages are not ordinarily recoverable for breach of contract.' This is a red herring and ignores Donaldson's claim for breach of the covenant of quiet enjoyment." ECF No. 109 at 3 (quoting ECF No. 82-1 at 2); *see also* Comp., ECF No. 1.

[6] That Donaldson's briefing relies entirely on his claim for breach of the covenant of quiet enjoyment as the basis for the compensatory damages for emotional distress that he seeks is puzzling. Donaldson also brings a claim under the Connecticut Unfair Trade Practices Act, or CUTPA. whether emotional distress damages are recoverable under CUTPA. Compl. at 8-9. As to "whether emotional distress damages are recoverable under CUTPA . . . [t]here is no Appellate authority [] and there is a split of authority amongst the trial courts." *Odell v. Wallingford Mun. Fed. Credit Union*, 2013 WL 4734783, at *35 (Conn. Super. Ct. 2013). But neither Donaldson's damages analysis nor his opposition to Grous's motion *in limine* argue that he can recover damages for emotional distress under CUTPA, so the Court will consider this argument forfeited.

While it is true, as Donaldson claims, that Connecticut courts have "held that damages for emotional distress are available for a plaintiff who was exposed to mold in a residence even without physical injuries,"[7] the cases he cites do not address this more specific question. In the first of his three cases, *Hrebenko v. Birchwood Cheshire Condo. Assoc., Inc.*, 2022 WL 2339528 (Conn. Super. Ct. 2022), the Court explained that Connecticut courts have allowed for "a claim of emotional distress arising from exposure to sewage in a property-damage-type scenario." *Id.* at *2 (citing *Duffy v. Wallingford*, 49 Conn. Supp. 109, 122 (2004)). The Court then explained that, like exposure to sewage, "exposure to mold is an environmental problem recognized in numerous court decisions," and therefore held that exposure to mold could give rise "to what may loosely be referred to as environmental-type claims–emotional distress or direct injury resulting from exposure to heat and/or mold," *id.* at *3, "due not to mere damage to property but to personal exposure and concerns about health," *id.* at *2.

Notably, however, there is no indication that the *Hrebenko* plaintiff was bringing a claim for breach of the covenant of quiet enjoyment. Instead, as that Court explained, the "owner of a condominium unit" brought claims against his condominium association and "an entity described as a management company hired by [the condominium association]." *Id.* at 1. That plaintiff "invoked a number of theories" to claim that "the improper maintenance and repairs of the boiler . . . has resulted in damage to his unit." *Id.* (cleaned up). And the Court in *Hrebenko* was evaluating a motion to strike which is "a means of testing the legal sufficiency of a cause of action or of a claim for relief," not a "challenge to the components allowable in a claim for damages." *Id.* at *2. Therefore, *Hrebenko* concluded that the defendant had not

---

[7] ECF No. 109 at 3.

"established [the] legal insufficiency" of a standalone claim for "environmental-type claims–emotional distress or direct injury resulting from exposure." *Id.* at *5, *3.[8]

The problem for Donaldson, however, is that he brought neither a standalone environmental exposure injury claim nor a claim for emotional distress. And while he perhaps could point to *Hrebrenko* to support a standalone claim of that sort, *Hrebrenko* does little to demonstrate that damages for emotional distress are a part of the compensatory damages contemplated as the remedy for breach of the covenant of quiet enjoyment.

The other two cases Donaldson cites are similarly off-base. For example, Donaldson cites *Lecara v. Guillotte*, 2002 WL 31319458 (Conn. Super. Ct. Sept. 24, 2002), as "awarding emotional distress damages on claim for breach of covenant of quiet enjoyment."[9] Not so: a careful review of that brief order instead shows that the *Lecara* Court found that the plaintiff had "not proven" damages for "[b]reach of quiet enjoyment and emotional distress" and awarded zero damages for this line-item in a list of requested damages. *Lecara*, 2002 WL 31319458 at *1. And in any case, this brief order—quite literally, a list of claims and dollar amounts without any reasoning or analysis—does not clarify whether that particular line-item considers two standalone claims, one for breach of the covenant of quiet enjoyment and one for emotional distress, or one standalone claim and the basis of the damages sought to remedy that claim. *Id.* Therefore, *Lecara* provides no support whatsoever for Donaldson's position.

---

[8] This reasoning may also be rooted in the line of cases establishing that a claim for the tort of emotional distress may be brought on the basis of an individual's reasonable fear of physical harm to themselves. *Strazza v. McKittrick*, 146 Conn. 714, 718-19 (1959) (A plaintiff may recover emotional distress damages if "the defendant's negligence proximately caused fright or shock in one who was within the range of ordinary danger.").

[9] ECF No. 109 at 3.

The third case, *Wishneski v. Sielski*, 2016 WL 1038817 (Conn. Super. Ct. 2016), presents exactly the same issue as *Hrebenko*. Though Donaldson correctly cites *Wishneski* as "permitting recovery of emotional distress where property damage caused by flooding caused concerns for residents' health and safety,"[10] the case does little to establish that Donaldson may seek damages for harms suffered as a result of the emotional distress he claims he endured as a result of the breach of the covenant of quiet enjoyment. The *Wishneski* plaintiff explicitly brought specific claims for both "intentional infliction of emotional distress (count six), and negligent infliction of emotional distress (count seven)." *Id.* at *1.

Donaldson has conclusively established the less-than-remarkable proposition that "Connecticut has determined that there are situations where recovery of emotional distress damages without the accompanying impact should be permitted." *Chamberland v. Physicians for Women's Health, LLC*, 2006 WL 437553, at *5 (Conn. Super. Ct. 2006). But the ultimate question remains: Are damages for emotional distress permitted as compensatory damages for the tort of breach of the covenant of quiet enjoyment?

As far as this Court can tell, no Connecticut authority directly addresses this question.[11] Donaldson seems to argue that because Connecticut law does not necessarily require personal

___

[10] ECF No. 109 at 3. The language in this opinion too regarding "concern for residents'' health and safety" similarly seems to implicate *Strazza* and associated cases regarding fear of injury to oneself. Donaldson, by contrast, apparently seeks emotional damages for any of the stresses suffered as a result of the entire situation, including, for example, the stress of moving.

[11] Issues unaddressed by state courts are often good candidates for certification to those very courts. "Whether we ask a state court to resolve unsettled legal questions will depend on, among other factors: (1) the absence of authoritative state court decisions; (2) the importance of the issue to the state, and (3) the capacity of certification to resolve the litigation." *Runner v. N.Y. Stock Exch., Inc.*, 568 F.3d 383, 388 (2d Cir. 2009). "[W]e do not certify a question of unsettled state law merely

injury for the return of damages, this recovery ought to be permitted. Grous, for his part, argues that the general prohibition on the recovery of compensatory damages for emotional distress in breach of contract actions ought to control the question in this case.

There is certainly some logic to Grous's view. After all, the covenant of quiet enjoyment is, at its core, merely an "implied contractual provision." *Berry v. Black Rock Gardens, LLC*, 2024 WL 2933003, at *9 (Conn. Super. Ct. 2024). On the other hand, courts have split as to whether claims for the breaches of other covenants that are also implied contractual provisions sound in tort or contract. For example, "[a]lthough a Connecticut action for breach of the covenant of good faith and fair dealing is based on the existence of a contract, courts have held that the action sounds in tort." *Motiva Enter. LLC v. W.F. Shuck Petroleum*, No. 3:10-CV-793-JCH, 2012 WL 601245, at *8 n.9 (D. Conn. Feb. 22, 2012).

Two decisions from the state courts of our neighbor to the north, however, reached the question presented in this action. *Homesavers Council of Greenfield Gardens, Inc. v. Sanchez*, 70 Mass. App. Ct. 453, 458 (2007) ("We see no reason in law or policy why emotional distress, where foreseeable, should not be viewed as a consequence of interference with quiet enjoyment."); *Simon v. Solomon*, 385 Mass. 91, 107–111 (1982) (vacating damages for emotional distress for a breach of the covenant of quiet enjoyment as redundant with a separate award for reckless infliction of emotional distress, but holding that the emotional damages

---

because state law permits it." *Id.* Rather, "[w]e resort to certification sparingly, mindful that it is our job to predict how the [state high court] would decide the issues before us." *Highland Capital Mgmt., LP v. Schneider*, 460 F.3d 308, 316 (2d Cir. 2006). On the eve of trial, certification is almost certainly unwise. It is particularly a mistake where, as here, (1) the issue is only one small part of the entire action and (2) would contribute more to the protraction of this long-running case than to its resolution.

award for breach of the covenant could support the recovery of attorneys' fees allowed for proven violations of that covenant and declining to question the trial judge's instruction that actual and consequential damages under that tort could include emotional distress damages).

*Sanchez* addresses the issue in greater detail. That Court focused on the distinction between negligent conduct, which is all that is required to support the tort of breach of the covenant of quiet enjoyment, and the heightened willful or reckless standard that is required to make out a claim for intentional infliction of emotional distress. 70 Mass. App. Ct. at 457. "If foreseeable harm follows causally from the negligence, there is no basis for elevating the burden of proof of a single kind of harm (i.e., emotional distress) to that required with respect to a common-law tort where either intentional or reckless behavior must be present." *Id.* The *Sanchez* Court ultimately concluded that "[s]uch an interpretation is inconsistent with the objectives of those remedial landlord-tenant statutes" and found no basis for concluding that these damages were unrecoverable in such an action.

The Court agrees with *Sanchez*: The traditional reason for limiting emotional distress damages in breach of contract actions is far less applicable here. "[I]n contract law, there is a strict limitation on the measure of damages" that essentially resolves to the foreseeability of such damages: "'Damages are not recoverable for loss that the party in breach did not have reason to foresee as a probable result of the breach when the contract was made.'" *Sutera v. Est. of Washton*, 2003 WL 1478788, at *8 (Conn. Super. Ct. 2003) (quoting Restatement (Second) of Contracts § 351 (1981)). This reasoning behind this limitation—foreseeability—applies with much less force to breaches of the covenant of quiet enjoyment: It is certainly more foreseeable that emotional harm would result from being forced to vacate one's home due to its inhabitability than to result from the breach of a run-of-the-mill contract for goods

or services. Instead, the relationship between landlords and tenants is quite similar to the relationship between innkeepers and their guests, which has long been held to support compensatory damages for emotional harm. *See Restatement (Second) of Contracts* at § 353 (acknowledging the general rule that "[d]amages for emotional disturbance are not ordinarily allowed" but holding that certain such damages were allowed in certain exceptional situations, including breaches of "contracts of carriers and innkeepers with passengers and guests.").

It is significant that courts and legislatures have developed a body of law affording particular protection to tenants where a standard breach of contract actions would almost certainly already apply. Instead, courts and legislatures have concluded that the dynamics between tenants, who rely on landlords to provide them with a viable home (or other important space), require particular protection. And the Connecticut Supreme Court has long held that such remedial provisions of law are to be "construed generously to accomplish [their] purpose." *Pizzuto v. Commissioner of Mental Retardation*, 283 Conn. 257, 265 (2007). It is black-letter law that the aim of compensatory damages is "to restore an injured party to the position he or she would have been in if the wrong had not been committed." *Rizzuto v. Davidson Ladders, Inc.*, 280 Conn. 225, 248 (2006). Without compensation for this foreseeable harm, a plaintiff who proves a breach of the covenant of quiet enjoyment would not be fully restored to their prior position.

In light of these principles, the Court concludes that to broadly construe this remedial body of law and to restore the plaintiff to the position he would have been in if unharmed

requires allowing him to seek damages for his emotional distress.[12] Therefore, the Court will allow Donaldson to present evidence regarding these damages to a jury and denies Grous's motion to preclude Donaldson from doing so.[13]

Even if damages of this sort are permitted, Grous argues, this Court should limit *who* may testify regarding Donaldson's emotional state and should limit the ability of their family members regarding their own emotional state. Grous does not cite a particular rule of evidence but references relevance and risk of confusing the jury, so the Court will construe these claims as arising under Federal Rules of Evidence 402 and 403. These rules require the exclusion of irrelevant evidence, Fed. R. Evid. 402, and of "relevant evidence if its probative value is substantially outweighed by a danger of . . . unfair prejudice, confusing the issues, [and] misleading the jury," among other reasons, Fed. R. Evid. 403.

---

[12] It is true that the dollar amounts at dispute in this action far exceed those usually contemplated by the image of the powerless tenant fighting a well-resourced landlord, but that is, of course, no basis for an exception to the broad remedial purpose of the covenant.

[13] Grous also argues that he was not on notice of Donaldson's desire to seek such damages because "the Complaint fails to make any factual allegations or claim for relief with respect to emotional distress damages" and because the damages analysis "does not offer any computation" for such damages, only listing "'TBD.'" ECF No. 82 at 6. The Court disagrees. Grous cites no law for the proposition that Donaldson was required to include in his complaint "factual allegations" related to the makeup of his claim for compensatory damages as a result of the breach of the covenant. And Donaldson's damages analysis, provided to Grous about two months after the Court granted the Parties' scheduling order, described these damages. *See* ECF No. 82-1 at 4, ECF No. 16. If, as Grous claims, "no discovery was taken on the issue of emotional distress damages," that fault is his alone: Grous has already deposed Donaldson at length. To the extent that Grous has not had the opportunity to depose, for example, an expert on such damages, that is because Donaldson has not disclosed any such experts. Perhaps that decision may harm Donaldson's attempt to convince the jury of such damages at trial, but it is no basis for precluding Donaldson outright from arguing for emotional distress damages.

The Court will deny Grous's requests to outright preclude any such testimony but reserves for decision in the context of trial whether any particular question or answer in testimony violates these rules. First, the Court notes that as Donaldson is the only plaintiff in this action, he is the only individual who can seek damages. Donaldson does not contend that he, as the lessee, may bring an action for emotional harms to nonparties. But that does not mean that only he can testify regarding his emotional state. Instead, others may offer evidence to corroborate his claims for damages, so long as that evidence is otherwise admissible.

Second, the Court declines to outright preclude other individuals from testifying regarding their own mental states. The Court recognizes the concern that allowing Donaldson's family members (chiefly, his then-fiancée Briana Miller) to testify at length regarding their own emotional state could create "the classic trial within a trial that Rule 403 seeks to prevent" by causing the jury to consider claims and surrounding facts foreign to the instant matter. *Hart v. RCI Hosp. Holdings, Inc.*, 90 F. Supp. 3d 250, 280 (S.D.N.Y. 2015). But "[a]fter all, the point of a trial is for parties and witnesses to testify in the first instance about what facts are true" and it is the job of jury "to listen and decide [which] facts are true." *DeAngelis v. City of Bridgeport*, No. 3:14-CV-0161-JAM, 2018 WL 429156, at *6 (D. Conn. Jan. 15, 2018). That job necessarily requires the jury to assess the credibility of various witnesses, *see Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000), and the jury cannot do so if it is deprived of important context. Here, Donaldson has made clear that concern surrounding the mold drove his and Miller's actions in the key period in question, so allowing them to paint an accurate picture for the jury requires allowing them to introduce some evidence regarding their emotional state.

Further, the Court concludes that testimony as to Miller's emotional state presents a low risk of prejudice or confusion of the jury, provided that this testimony is not overly redundant and that the Court's instructions are clear that damages may be awarded only for Donaldson's injuries. *See Williams v. Artus*, No. 11-CV-5541-JG, 2013 WL 4761120, at *18 (E.D.N.Y. Sept. 4, 2013) ("As a general proposition, the courts presume that juries are capable of understanding and following instructions." (citing *Richardson v. Marsh*, 481 U.S. 200, 211 (1987))). The Court concludes that testimony is likely to be more probative in allowing the jury to properly assess the credibility of witnesses than prejudicial in addressing emotional subjects. Therefore, the Court will not outright prohibit Miller from testifying as to either her own emotional state during the relevant period or to Donaldson's, but Grous remains free to object if the circumstances of the trial indicate a risk of confusion, redundancy or undue prejudice. Likewise, of course, Grous is free to testify regarding his own emotional state during the period at issue.

### B. Grous's motion *in limine* to preclude evidence concerning his obligations as a landlord

Grous has further moved to preclude Donaldson from offering "testimony, evidence or argument of counsel" that Grous "had any obligations under the lease or [Connecticut law] to do anything other than repair the mold conditions or other conditions [] necessary to keep the premises in a fit and habitable condition."[14]

The crux of this suit is whether Grous's home was habitable. "In this case, all three claims rise and fall on the same question: did the mold render the home unfit to live in?"

---

[14] ECF No. 84 at 1.

*Donaldson v. Grous*, 2024 WL 5057655, at *3 (D. Conn. Dec. 10, 2024). "Donaldson's claim for breach of contract turns on whether Grous breached his contractual obligation to keep the home 'fit and livable.'" *Id.* "Donaldson's claim for breach of the covenant of quiet enjoyment turns on whether he was constructively evicted from the home because Grous allowed the home to fall into a state in which habitation was 'untenantable.'" *Id.* And Grous's counterclaim turns on whether Donaldson can show that, under Connecticut law, Donaldson was relieved of his obligation to pay rent because Grous failed to keep the home 'fit and habitable.'" *Id.* Therefore, arguments about habitability and the state of the home will be front and center throughout the trial.

The particular dispute giving rise to Grous's motion arises out of an exchange of emails between attorneys for Donaldson and Grous at the time that Donaldson was contemplating leaving the home and Grous was seeking to remediate the mold. In that exchange, Donaldson's counsel first demanded that Grous return the home to a "fit and livable condition" as required by the terms of the lease.[15] Grous's counsel responded a few weeks later by confirming that "the mold remediation has been completed."[16] And, again through counsel, Donaldson responded:

> Please provide specific information on the remediation efforts
> undertaken by your client's contractor, including what areas they
> tested, where they found mold; how they remediated the mold;
> and what fixtures, furniture, walls and other pieces of the house
> were replaced as part of the remediation.  As we stated in our
> April 29 letter, my clients intend to have an independent mold

---

[15] ECF No. 84-1 at 8.

[16] ECF No. 84-3 at 3.

analysis performed before they decide whether the mold has been resolved.[17]

Grous's concern, he explains, is that a jury reading this exchange will be misled into the belief that Grous was obligated by statute or contract to do more than merely keep the home habitable.[18] Specifically, Grous argues that a jury might conclude from this exchange that he was obligated to provide the information that Donaldson's counsel requested. Grous contends that the evidence is not relevant because it does not have a tendency to make any fact of consequence in the action more or less probable, *see* Fed. R. Evid. 401, and is therefore inadmissible, *see* Fed. R. Evid. 402.

Donaldson concedes that, at first blush, what Grous's obligations were under Connecticut law looks like a question of statutory interpretation committed to the Court.[19] But Donaldson contends that his counsel's email "as well as Grous's counsel's silence in response" is "highly relevant to whether the house was actually remediated as of that date and Grous's conduct during the critical period when he was charged by law with remediating the mold infestation."[20] Donaldson apparently concedes that he does not "seek[] to offer testimony, evidence and argument that Grous was obligated to do more than just remediate."[21] Instead, Donaldson argues that the email exchange is relevant to determining whether the mold was

---

[17] *Id.* at 2.

[18] ECF No. 84 at 3.

[19] ECF No. 110 at 3.

[20] *Id.*

[21] *Id.* at 4 (quotations omitted).

remediated because a jury presented with this evidence could make permissible inferences about whether the mold was remediated, which is the key fact of consequence in this dispute.

The Court agrees. Rule 401 imposes a "relatively low bar" to show relevance. *United States v. Ray*, 585 F. Supp. 3d 445, 459 (S.D.N.Y. 2022). Perhaps Grous is correct that any inference from his counsel's silence might be weak. But it cannot be said that there is no permissible, relevant inference to be made: For example, perhaps a jury could infer that Grous was not taking remediation seriously and thus that remediation was less likely to be complete at that time; or, perhaps a jury could infer that Grous lacked good evidence to support his claim of remediation. Of course, inferences against Donaldson and in Grous's favor could be made from the same email exchange. But "the task of choosing among competing, permissible inferences is for the [jury], not for the [] court." *United States v. McDermott*, 245 F.3d 133, 137 (2d Cir. 2001).

Nor can it be said that the emails that Grous seeks to preclude are overly prejudicial. *See* Fed. R. Evid. 403. Grous contends that they might confuse the jury as to his obligations. The Court disagrees. First, the emails simply do not claim to be authoritative on Connecticut law or the terms of the lease. Second, the Court's instructions will clearly lay out Connecticut law on the issue and will instruct the jury to apply the law only as the Court describes it. The Court, therefore, concludes that the jury is entirely capable of separating legal duty from simple request and that the emails in question are not overly prejudicial. Grous's motion *in limine* regarding these emails is therefore denied.

### C.    Grous's motion *in limine* to preclude testimony regarding medical symptoms

Third, Grous motions *in limine* to preclude testimony by Donaldson and Miller, regarding their medical symptoms and those of their child.[22] According to Donaldson and Miller, the coughs and congestion they experienced provide important context because these symptoms were the genesis of their complaints to Grous, which in turn prompted the full mold discovery.[23] Grous correctly notes that whether the mold presented a risk to the health of the home's inhabitants is a crucial issue to the home's underlying habitability: "Habitability is defined as 'the condition of a building in which inhabitants can live free of serious defects that might harm health and safety.'" *Collier v. Adar Hartford Realty, LLC*, 2022 WL 18054024, at *10 (Conn. Super. Ct. 2022) (quoting Black's Law Dictionary (8th ed. 2004)).

Grous contends that any testimony by Donaldson and Miller regarding their symptoms "should be excluded as speculative, irrelevant, and unfairly prejudicial."[24] Relevance, of course, can be swiftly disposed of. As Grous himself admits, whether the mold caused a health and safety issue is an important question, and a jury *could* of course infer from the emergence of medical symptoms in occupants of the home that the mold was causing these symptoms.

Grous's further objections are similarly disposed of. For example, that Donaldson and Miller are "not medical doctors or toxicologists"[25] might make for highly effective cross-examination, but it is not a basis to deny them the ability to testify about their firsthand

---

[22] ECF No. 85.

[23] ECF No. 111 at 3.

[24] ECF No. 85.

[25] *Id.* at 4.

experiences. *See Sumpter v. Snyder*, No. 9:20-CV-00619, 2025 WL 53138, at *4 (N.D.N.Y. Jan. 9, 2025); *see also Johnson v. Mauro*, No. 16-cv-00622, 2019 WL 2336070, at *6 (N.D.N.Y. June 3, 2019) ("[U]nder Federal Rule of Evidence 701, a lay witness's testimony 'in the form of an opinion is limited to one that is . . . rationally based on the witness's perception' and 'not based on scientific, technical, or other specialized knowledge within the scope of Rule 702.' [Defendant] may testify concerning his perceptions . . . [such as] his symptoms, and physical pain. He may not, however, testify to opinions 'based on scientific, technical, or other specialized knowledge.'" (quoting Rule 701)). And, at the pretrial conference, Donaldson made clear that neither he nor Miller would offer medical opinion testimony.

Therefore, to the extent that Donaldson or Miller seek to opine as to the basis of their symptoms from a medical perspective, Grous is free to object to that testimony at trial. But a lay witness may testify as to the symptoms they experienced, including, for example, drawing connections on the basis of their experience: Just as a runner might testify that their knee began to hurt after they tripped and fell, so too can Donaldson and Miller testify that their symptoms developed after moving into their home. Nor can it be said that this testimony would be overly prejudicial. Juries are entrusted with weighing the testimony of lay and expert witnesses against each other, *Williams v. Goord*, 142 F. Supp. 2d 416, 427 (S.D.N.Y. 2001), and Donaldson and Miller will both be subject to "the crucible of cross-examination," which is the "constitutionally prescribed method of assessing reliability." *Crawford v. Washington*, 541 U.S. 36, 61-62 (2004).

The Court declines to preclude Donaldson and Miller from testifying as to the symptoms that they experienced and denies Grous's motion *in limine* to that effect. But the

Court notes that Donaldson and Miller's testimony must comport with the limitations of Federal Rules of Evidence 701 and 702, as well as all other relevant proscriptions.

### D.    Grous's motion *in limine* to preclude testimony by Jack Yanqui as an expert witness

Grous next moves *in limine* to prevent Jack Yanqui, an industrial hygienist and licensed mold assessor who conducted mold testing in the home at issue, from testifying in this case as an expert.[26] Grous concedes that Yanqui may testify in this case as a fact witness because he has personal knowledge with respect to facts in dispute; namely, Yanqui personally inspected the home and observed the mold in question.[27] But Grous contends that Yanqui lacks the qualifications necessary to testify as an expert regarding "the health effects mold may have on a person and whether or not the premises was habitable."[28]

After collecting mold samples from the home, Yanqui sent those samples out for testing and prepared a report on the results. Donaldson, for his part, explains that he seeks to offer Yanqui as a fact witness regarding the mold he saw in the house and the policies of BNF Consulting, Inc., his employer of five years, regarding its categorization of risks presented by certain types of mold.[29] Donaldson contends that Yanqui is not offered as an expert or opinion witness.[30] The BNF reports are critical evidence regarding the presence of mold in the home,

---

[26] ECF No. 86.

[27] *Id.* at 1-2.

[28] *Id.* at 1.

[29] ECF No. 112 at 3.

[30] *Id.*

Donaldson avers, so Yanqui's testimony will allow the jury to correctly interpret and evaluate the trustworthiness of these reports.

This motion *in limine* appears moot, at least at this pretrial stage. There are no objections to any portions of the BNF reports which Yanqui in part prepared. Grous asks for preclusion of Yanqui as an opinion witness; Donaldson avers that he will not offer Yanqui as an opinion witness. If, at trial, Yanqui's testimony appears to tend towards opinion testimony rather than fact testimony, Grous is welcome to renew his objection then to specific lines of questioning. If Yanqui's testimony is limited to the unobjected-to report he prepared for BNF, that testimony is properly considered fact testimony. But if his testimony strays beyond the that report or his personal knowledge as to the state of the home, it may well be opinion testimony subject to an at-trial objection. Given the apparent high-level agreement of the Parties as to the legal rules that should operate to limit Yanqui's testimony, the Court declines to address the issue further at this time and denies as moot Grous's motion *in limine*.

### E.    Grous's motion *in limine* to preclude testimony by Dr. David Rosenstreich as an expert witness

Grous further seeks to preclude the testimony of Donaldson's expert, Dr. David Rosenstreich. Expert testimony is admissible if the following conditions are met:

> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied principles and methods to the facts of the case.

Fed. R. Evid. 702; *see also Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993). The Court's role is to act as a "gatekeeper" to ensure that the expert's testimony is relevant and

rests on a reliable foundation. *See In re Vivendi, S.A. Secs. Litig.*, 838 F.3d 223, 253 (2d Cir. 2016).

Dr. Rosenstreich is "an Internal Medicine specialist and an Allergy/Immunology specialist" with more than forty years of experience.[31] Grous, therefore, does not contest Dr. Rosenstreich's general qualifications. Instead, Grous contends that Dr. Rosenstreich's opinions are not supported by the research he cites, are overly broad, and lack sufficient basis in testing performed on the home and on Donaldson and his family.

First, and most broadly, the Court rejects each argument that Grous makes claiming that insufficient testing on Donaldson or the home has been done to allow Dr. Rosenstreich to offer an opinion on an issue. Each of these claims confuses an important limit on the strength of Dr. Rosenstreich's testimony with a basis for excluding the claim altogether. For example, Grous contends that Dr. Rosenstreich cannot offer an expert opinion as to whether mold rendered the home uninhabitable because although BNF's testing revealed the genus of the mold, no testing was done to determine whether the mold was of a species that is dangerous to human health. But Dr. Rosenstreich reviewed the testing from BNF regarding the presence of mold in the home, and the question this action presents is whether the home was habitable in general, not whether the home was habitable for Donaldson or his family specifically or whether the home was habitable in all cases. More testing might have strengthened Rosenstreich's testimony, but his testimony nonetheless has a reliable basis and cannot be excluded.

---

[31] ECF No. 88 at 3.

As a second example, Grous seeks to preclude Dr. Rosenstreich from testifying about whether the home's air system would sufficiently disperse the mold around the home to render all portions of the home uninhabitable. Grous avers that "that there was no testing done to determine whether mold actually spread through the ventilation system,"[32] and therefore that Dr. Rosenstreich's opinion that tenants were "at risk from developing medical problems from the mold exposure anywhere in the house"[33] as a result of the HVAC system should be precluded. If additional testing had been conducted and had produced results consistent with Dr. Rosenstreich's opinion, that testing certainly may have strengthened Dr. Rosenstreich's testimony. But Dr. Rosenstreich's testimony is based on sufficient facts—namely, the various BNF reports on mold in the home and blueprints of the home—to allow him to form and offer an opinion on that issue.

Grous next seeks to distinguish between a *potential* threat and a "serious" threat: "The standard is whether the mold was a *serious* threat to the health and welfare, not whether the mold was a *potential* threat."[34] This pedantic argument is unconvincing. Dr. Rosenstreich's testimony speaks to the sort of threat that mold could form, and whether that threat is sufficient to render the home uninhabitable is the crux of the jury questions in this case. That is, whether the threat posed by mold rose to the level of uninhabitability is the key question, and Dr. Rosenstreich's opinion will clearly assist the jury in evaluating that question. In essence, Grous

---

[32] *Id.* at 13.

[33] ECF No. 88-2 at 61-62.

[34] ECF No. 88 at 17 ("Dr. Rosenstreich does not have any reliable opinions that the mold within the home was dangerous, such that it would pose a serious threat to the health and welfare of the occupants. Instead, his opinions are that the mold is potentially dangerous.").

argues that the threat posed by mold is not serious enough to rise to that level. As the Court made clear at summary judgment, however, exactly that question is for the jury, not the Court, *Donaldson*, 2024 WL 5057655, and a jury presented with Dr. Rosenstreicih's testimony could certainly conclude as much. Of course, Grous may well succeed in proving to the jury that the mold threat remained remote enough that the home was still livable. But that is his task at trial, not the Court's in a motion *in limine*.

Grous further seeks to preclude any testimony by Dr. Rosenstreich about Donaldson and his family's symptoms on the basis of Dr. Rosenstreich's testimony that he was not offering an opinion regarding the cause of the tenants' symptoms.[35] Again, though, Grous's argument misunderstands the relevance of the symptoms that Donaldson and his family say they experienced. These symptoms might allow the inference that the mold in the home was of a volume and type sufficient to cause health issues, which in turn speaks to habitability. Whether the symptoms that the tenants describe are consistent with mold exposure, therefore, is a critical question. Dr. Rosenstreich's concession that he cannot establish causation does not preclude him from testifying as to whether mold *might* have caused these symptoms, nor does it render the basis for his testimony unreliable. And, again, Grous further objects on the basis of prejudice, but to the extent that a lack of testing limits Dr. Rosenstreich's ability to offer an opinion regarding the ultimate causation of the tenants' symptoms, that simply forms the basis for rebuttal and cross-examination.

---

[35] ECF No. 88 at 18.

Lastly, Grous seeks to preclude Dr. Rosenstreich from testifying that exposure to mold could have deleterious effects on children.[36] He argues that this opinion should be precluded because the study it chiefly cites included different circumstances than those facing Donaldson's child: several years of exposure, rather than several weeks, and potentially exposure to greater amounts of mold. But the question the jury will decide is not whether Donaldson's daughter was harmed: This is not a personal injury action. Instead, the question is whether the home was habitable. And whether the home would have proved dangerous for children in the long run is certainly relevant to its habitability.[37] Therefore, the Court denies in full Grous's motion *in limine* to limit the testimony of Dr. Rosenstreich.[38]

### F.    Both Parties' motions to preclude certain late-disclosed witnesses

Donaldson and Grous both seek to preclude each other from offering allegedly untimely witnesses.[39] Grous seeks to preclude three of Donaldson's witnesses, two of whom are Grous's former attorneys. Donaldson, meanwhile, seeks to preclude three of Grous's witnesses, one of whom is Donaldson's own prior counsel.

Federal Rule of Civil Procedure 26(a) requires a party to disclose, without awaiting a discovery request, the name of "each individual likely to have discoverable information—

---

[36] ECF No. 88 at 11-12.

[37] Likewise, the Court declines Grous's request to preclude Dr. Rosenstreich's opinion that risk increases with exposure. *See id.* at 9. Grous contends that "Dr. Rosenstreich did not have any data . . . concerning the length of time the occupants were at the premises," but this is irrelevant: The issue is not whether Donaldson and his family were at the premises long enough to be at this increased risk, but rather the objective question of whether the home was habitable.

[38] ECF No. 88.

[39] ECF Nos. 83 and 89.

along with the subjects of that information—that the disclosing party may use to support its claims or defenses." *Id.* at 26(a)(1)(A)(i). "The purpose of this disclosure is to alert an opposing party of the need to take discovery of the named witness." *Pal v. New York Univ.*, 2008 WL 2627614, at *4 (S.D.N.Y. June 30, 2008). Moreover, if "additional or corrective information" becomes available, a party is obligated to timely supplement this disclosure. Fed. R. Civ. P. 26(e)(1).

Under Rule 37(c)(1), if a party fails to identify a witness as required by Rule 26(a), the party is not allowed to use that witness to supply evidence at trial, "unless the failure was substantially justified or is harmless." Fed. R. Civ. P. 37(c)(1). In deciding whether to exclude testimony, the Court considers "(1) the party's explanation for the failure to comply with the disclosure requirement; (2) the importance of the testimony of the precluded witnesses; (3) the prejudice suffered by the opposing party as a result of having to prepare to meet the new testimony; and (4) the possibility of a continuance." *Patterson v. Balsamico*, 440 F.3d 104, 117 (2d Cir. 2006) (cleaned up). "[C]ourts have broad discretion in determining whether and how to impose sanctions," *Preuss v. Kolmar Laboratories, Inc.*, 970 F. Supp. 2d 171, 175 (S.D.N.Y. 2013), and "[p]reclusion is a <u>harsh</u> remedy that should only be imposed in <u>rare</u> situations," *Lujan v. Cabana Mgmt., Inc.*, 284 F.R.D. 50, 68 (E.D.N.Y. 2012) (emphasis added). Here, there is no possibility of a continuance: This action has remained unresolved for many years, and the machinery of trial is far along. To extend the trial date further still would unnecessarily delay the resolution of this action and thus would not serve the ends of justice.

First, the Court grants the motions *in limine* as they relate to each of the former attorneys. The two attorneys that Donaldson seeks to call—Robert Sisca and Philip Russell— were disclosed only during the drafting of the joint trial memo, far after the close of

discovery.[40] Similarly, the attorney that Grous seeks to call—James Denlea—was disclosed in a supplemental disclosure after the close of discovery.[41] Each of these, the Court concludes, are unlikely to offer significant testimony: By and large, neither party identifies testimony that each may provide that is not already available on the basis of stipulated exhibits or testimony that cannot be offered by other witnesses. And "[c]ourts are understandably leery of turning trial counsel in the case before them into subpoenaed witnesses, because too often it is an effort to harass and intimidate and make trouble for a party by going after the lawyer." *Rubis v. Hartford Fire Ins. Co.*, No. 3:11-CV-796-WWE, 2012 WL 996530, at *1 (D. Conn. Mar. 23, 2012) (collecting cases). Therefore, the Court grants the motions *in limine* with respect to the Parties' efforts to require each other's attorney(s) to testify.

Next, the Court turns to Donaldson's motion to preclude Brian Gerard's testimony. Gerard was not disclosed until mid-2024, roughly a year in advance of trial but shortly after the close of discovery.[42] Donaldson has had many months in which to move to preclude Gerard or to move for an out-of-discovery deposition. Therefore, the Court concludes that there is little prejudice in this delayed disclosure. And Gerard's testimony regarding remediation efforts will be substantially helpful to the jury in evaluating the key issue this case presents. Such minor prejudice cannot support the harsh sanction of precluding important testimony, and the Court therefore denies Donaldson's motion as to Gerard.

---

[40] ECF No. 89 at 2.

[41] ECF No. 83-1 at 3.

[42] ECF Nos. 52, 107-1.

Donaldson's motion as to Susan Calabrese presents different considerations. Calabrese was not disclosed as a witness until the late stage of the joint trial memorandum.[43] That Donaldson has had limited discovery in the form of text messages related to Calabrese for years does not substantially impact the prejudice he faces from having been denied the chance to depose her. Rather than the almost full year that Donaldson had to seek to depose Gerard, Donaldson had only a few months between disclosure and trial in which to seek an out-of-time deposition of Calabrese. Simply put, the drafting of a pretrial memorandum is far too late to introduce a witness to the litigation for the first time. Therefore, the Court grants Donaldson's motion to preclude Susan Calabrese's testimony.

Lastly, Grous seeks to exclude the testimony of Shanna Baldwin, one of Donaldson's business managers.[44] Like Calabrese, Baldwin was not disclosed until a few months before trial, during the preparations for the pretrial memorandum. But, unlike Baldwin, Grous has already noticed and deposed Baldwin in this litigation. He cannot now claim that he faces substantial prejudice as a result of Baldwin's entrance as a witness. Grous's strongest claim to prejudice is that Donaldson might seek to question Baldwin regarding matters outside the scope of her deposition. This, the Court concludes, would constitute prejudice, in the same way that allowing Calabrese to testify without a deposition on the subject would prejudice Donaldson. But Donaldson represented at the pretrial conference that he would limit his questioning of Baldwin to the subjects that were the focus of her deposition. Accordingly, the Court denies Grous's motion to preclude Baldwin from testifying but notes that her testimony

---

[43] ECF No. 107 at 9.

[44] ECF Nos. 89, 113 at 3.

must be limited to the subjects of her deposition. Grous is welcome to raise an objection should Donaldson's questioning of Baldwin seek to stray from the subjects discussed in her deposition.

### G.    Donaldson's motion *in limine* to preclude Grous from testifying regarding certain issues

Donaldson further seeks to preclude Grous from testifying regarding certain issues for which, Donaldson argues, Grous's deposition answers were insufficient.[45] Specifically, Grous seeks damages for some number of items of his property that he claims were damaged by Donaldson or his agents. These items include, for example, "furniture, cosmetics, tools, medications, kitchenware and bottles of alcohol."[46]

Donaldson argues that Grous "unreasonably" failed to provide sufficient detail in response to questions regarding the value of these items.[47] It is common sense that remembering the exact price of a bottle of alcohol one purchased several years prior is a difficult task, so Grous's failure to provide such specifics is understandable. It is Grous's burden at trial to convince a jury of the damages he suffered, and his failure to provide the details that Donaldson describes may prove an obstacle to fulfilling that burden. But it is no basis to exclude Grous's testimony on that subject altogether. The Court's review of the deposition transcript[48] does not indicate that Grous's answers were sufficiently unreasonable to warrant the sanction of preclusion. Therefore, Donaldson's motion to preclude Grous from

---

[45] ECF No. 83-1 at 6.

[46] *Id.*

[47] *Id.*

[48] ECF No. 83-3.

testifying as to these issues is denied. Of course, if Grous's testimony at trial varies from his deposition testimony, Donaldson is free to make these differences clear to the jury during the crucible of cross-examination.

### H.     Grous's argument regarding mold typology

In closing, the Court will specifically address one argument that Grous makes time and again throughout several of his motions *in limine*: That because testing revealed only the *genus* of the mold, and not the *species* of mold, Donaldson lacks sufficient evidence to testify as to the mold's dangerousness. The Parties apparently agree that some species of the molds found in testing of Grous's home are dangerous to humans, but not all, and that there is no way, at this stage, to know which species of mold were found in the home.

Grous argues that for this reason, (1) Donaldson's expert has no adequate basis to opine as to the dangerousness of the mold, and therefore that (2) it would be prejudicial to allow Donaldson and his family to testify regarding their symptoms without certainty that dangerous species of mold were present. This argument was also the basis of Grous's motion for summary judgment.[49] The Court (Meyer, J.) rejected that argument, and this Court agrees with the reasoning in that decision. *See Donaldson*, 2024 WL 5057655.

Donaldson cites a BNF report describing the mold as dangerous and a report from his expert doing the same, as well as circumstantial evidence in the form of the timing of the onset of their medical symptoms. *Id.* at *4. Grous cites testimony from his expert arguing the contrary. *Id.* But Grous's expert also lacks specific testing as to the *species* of the mold present in the home in April of 2022. Judge Meyer explained that "[c]hoosing between the views of

---

[49] *See* ECF No. 55.

competing experts and assessing whether to make a plausible inference is a job for the jury at trial." *Id.* As a result, he held that because the species of the mold could not be determined for certain and both Parties could only make inferences with the same information as to the mold's dangerousness, he could not "conclude that the type of mold in the home was so obviously not dangerous as to warrant summary judgment." *Id.*

Grous cites exactly one case that so much as differentiates between different types of molds. That case, a non-precedential and unpublished opinion which was front and center in his motion for summary jdugment, presents markedly different facts. *See Dubiel v. Bacchiochi*, 2023 WL 5700392 (Conn. Super. Ct. 2023). In *Dubiel*, "[n]o testing was done to determine whether the apparent mold is actually mold, and if so, what type of mold it might be." *Id.* at *2. Far from testing specific enough to identify the genus of the molds present, no testing whatsoever was done to even confirm if mold was present in *Dubiel*. And that Court took pains to note that there was no testimony or "medical evidence that [the *Dubiel* plaintiffs] have been affected by the mold." *Id.* at *4. Here, by contrast, Donaldson and his family have consistently testified that they had symptoms that arose after moving into the home, and their expert has opined that those symptoms are consistent with the symptoms of mold exposure. *Dubiel*, therefore, is best understood as concluding that no evidence whatsoever was put forward to establish mold and that mold type *could* have been one such sort of evidence. But *Dubiel* did not hold that establishment of the particular mold species was *required*.

If *Dubiel* had held that the establishment of mold species was required, it would have flown in the face of more established Connecticut caselaw. For example, in *Welsch v. Groat*, 95 Conn. App. 658 (2006), the Connecticut Appellate Court concluded that a home was rendered uninhabitable by a mold outbreak without any reference to mold 'type,' or species,

or genus. The Court therefore reaffirms the summary judgment holding that there is no basis in law to hold that a lack of testing as to the species of mold requires judgment as a matter of law in favor of a landlord where both sides have put forward competing evidence that would support inferences in either direction. As a result, the Court declines to preclude any testimony on the basis of this proposed conclusion of law.

## II.   <u>CONCLUSION</u>

For the reasons set forth above, the Court GRANTS the Parties' cross-motions *in limine* to preclude the Parties from calling each other's attorney(s) as witnesses and GRANTS Donaldson's motion to preclude Susan Calabrese from testifying.[50] All other motions *in limine* are DENIED subject to the limitations described herein: If witness testimony expands beyond those limitations, Grous may raise an objection to that specific testimony during trial.

**SO ORDERED.**

Hartford, Connecticut
May 12, 2025

/s/Vernon D. Oliver
VERNON D. OLIVER
United States District Judge

---

[50] The following witnesses are precluded: Calabrese, Denlea, Russell, and Sisca.